UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

OVIEDO MEDICAL CENTER, LLC,

        Plaintiff,

v.

ADVENTIST HEALTH SYSTEM/SUNBELT, INC.
D/B/A ADVENTHEALTH OVIEDO ER,

        Defendant.

CASE NO. 6:19-cv-01711-WWB-EJK

**RESPONSE IN OPPOSITION TO PLAINTIFF'S
RENEWED MOTION FOR ENTRY OF A PRELIMINARY INJUNCTION**

Defendant Adventist Health System/Sunbelt, Inc. ("AdventHealth") respectfully requests this Honorable Court to deny Plaintiff Oviedo Medical Center, LLC's ("OMC") Renewed Motion for Entry of a Preliminary Injunction (Dkt. 23) ("Renewed Motion").[1]

## I. SUMMARY OF ARGUMENT

The Court should deny OMC's request for extraordinary preliminary relief. More than ten months ago OMC learned AdventHealth planned to open a freestanding emergency care facility in Oviedo called the AdventHealth Oviedo ER. Now, nearly a year later and on the eve of its opening, OMC seeks to preliminarily enjoin AdventHealth from using the name. This Court routinely denies motions for preliminary relief based on mere months of inexplicable delay, which negates the requisite finding of irreparable harm under Rule 65. The Court should deny the Renewed Motion based solely on OMC's unexplained (and unexplainable) ten-month delay in seeking this relief.

---

[1] OMC filed its original Motion for Entry of Preliminary Injunction on September 3, 2019 (the "Original Motion"). (Dkt. 6.) OMC failed to serve the Original Motion pursuant to Local Rule 4.06, and withdrew the Motion after AdventHealth filed its response. (Dkt. 17.)

In addition to the unjustified delay warranting summary denial of the Renewed Motion, OMC utterly failed to demonstrate a likelihood of success on the merits of its underlying trademark claims. To prevail, OMC must prove it owns enforceable trademark rights to the term "Oviedo ER" (the "Mark"). But, descriptive marks like these are not enforceable under well-settled trademark law. Rightly so, the Mark merely describes the nature and geographic location of OMC's services – that OMC provides emergency room services in Oviedo. At best, the Mark is weak and enforceable only through proof of secondary meaning, which OMC wholly failed to establish here.

OMC cannot even establish that it owns the Mark. While OMC unequivocally asserted in its Complaint and Original Motion that it acquired the Mark in 2017 from a predecessor (Dkts. 1, ¶ 4; 6, p. 3), the only evidence submitted regarding the 2017 transaction was a quitclaim deed transferring real property. (Dkt. 23-5, Ex. 2.). Now, after the benefit of AdventHealth's response to its Original Motion, OMC provided a Nunc Pro Tunc Assignment of Intellectual Property Rights buried in Exhibit 4 of Exhibit E of OMC's Renewed Motion. Contrary to its bold assertion, the nunc pro tunc assignment was executed August 21, 2019, just weeks before this lawsuit was filed, and months after OMC first raised this issue with AdventHealth. (Dkt. 23-5, Ex. 4.) The back-dated assignment is insufficient to retroactively transfer intellectual property (or the associated goodwill necessary to enforce intellectual property rights) that was clearly not part of the 2017 transaction.

Instead, the nunc pro tunc assignment evidences the gravamen of this lawsuit – a retroactive attempt to prevent or make more difficult the opening of a nearby competing emergency room. Indeed all of the evidence OMC presented shows it sought to establish

"Oviedo ER" as a trademark only *after* AdventHealth announced plans to open its facility in November, 2018. Plaintiff failed to carry its heavy burden under Rule 65—even after ten months to prepare and prefect its claims and with the benefit of AdventHealth's response to the Original Motion. The Renewed Motion should be denied.

## II. FACTUAL BACKGROUND

AdventHealth is a non-profit health care provider based in Altamonte Springs, Florida. It operates health care facilities across the United States. It is one of the largest non-profit health care systems in the nation. As part of a national branding strategy emphasizing consistency and clarity in patient marketing and communication, AdventHealth adopted a strict and invariable naming protocol for its health care facilities. (Ex. A, Carter Aff., ¶ 3.) This protocol features the "AdventHealth" brand name followed by the geographic location of the facility and the category of services provided. (*Id.*) For example, emergency room facilities are designated the initials "ER." (*Id.*, ¶4.) This protocol is universally applied to all AdventHealth free-standing ER facilities in the United States. (*Id.*) In addition to the AdventHealth Oviedo ER facility, AdventHealth operates or plans to open eleven other adherently named free-standing emergency care facilities.[2] (*Id.*)

All AdventHealth facilities follow this carefully chosen naming convention. (*Id.*) In the Fall of 2018, AdventHealth announced plans to open a freestanding emergency room in Oviedo in the fall of 2019. (Ex. B.) Consistent with its naming convention, this facility will be called "AdventHealth Oviedo ER." (Ex. A, Carter Aff., ¶¶ 4-5.) OMC learned of

---

[2] AdventHealth Central Pasco ER, AdventHealth Deltona ER, AdventHealth Four Corners ER, AdventHealth Lake Mary ER, AdventHealth Lake Nona ER, AdventHealth Lenexa ER, AdventHealth Palm Harbor ER, AdventHealth South Overland Park ER, AdventHealth TimberRidge ER, AdventHealth Waterford Lakes ER, and AdventHealth Westchase ER. (*Id.*)

AdventHealth's Oviedo facility in 2018—its Director of Public Relations and Communications even attended the groundbreaking on November 1, 2018. (Dkt. 23-1, ¶ 32.) Now, almost a year later, OMC seeks to destroy AdventHealth's deliberate and consistent naming convention by claiming ownership of the descriptive terms "Oviedo" and "ER." Such a deviation would have significant negative financial consequences for AdventHealth, and undermine the key characteristic of its national branding strategy – consistency and clarity in patient communication. (*Id.,* ¶¶ 7-9.) It would deprive AdventHealth of the ability to inform patients about the location and nature of its services. An injunction would also prevent AdventHealth from opening the emergency care facility under the applied-for Agency for Health Care Administration ("AHCA") license, which will issue under the registered fictitious name "AdventHealth Oviedo ER" for October 17, 2019 opening. (Ex. K, Godfrey Aff., ¶ 4.) AdventHealth has significant existing obligations associated with the imminent opening of this facility that it will incur whether its doors open for patients or not.  These include labor costs and employee benefits, obligations for signed contracts (e.g. leases, physician coverage, and service providers), utility expenses, facility maintenance and upkeep, and professional fees (legal and marketing). Likewise, AdventHealth can never recover lost profits for each day the facility remains closed.

### III. ARGUMENT AND MEMORANDUM OF LAW

#### A.  Standard for Preliminary Injunction

To prevail on its Renewed Motion, OMC bears the heavy burden of clearly establishing: (1) a substantial likelihood of success on the merits of its underlying claims, (2) that it will suffer irreparable harm without an injunction (3) that exceeds the harm caused to

AdventHealth if the injunction issues, and (4) an injunction would not disserve the public interest. *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 774 (11th Cir. 2015). A preliminary injunction is an "extraordinary and drastic remedy" that cannot be awarded unless the movant clearly establishes each of the four prerequisites. *You Fit, Inc. v. Pleasanton Fitness, LLC*, Case No. 8:12-CV-1917, 2013 WL 521784, at *1 (M.D. Fla. Feb. 11, 2013), *quoting US. v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir.1983). OMC failed to carry its heavy burden and its request for extraordinary relief should be denied.

### B.  OMC Failed to Establish Irreparable Harm

This Court consistently denies motions for preliminary injunctions when the movant inexplicably waits several months to seek relief. *See Invue Security Products Inc. v. Vanguard Products Group, Inc.*, 8:18-CV-2548-T-33SPF, 2019 WL 4671143, at *6-7 (M.D. Fla. July 1, 2019) (Collecting cases denying motions for preliminary injunctions for unexplained or unjustified delays of more than two months and finding "Plaintiff's delay in seeking a preliminary injunction severely undermines a finding of irreparable harm."). Here, OMC's ten-month delay in seeking preliminary injunctive relief negates the requisite finding of irreparable harm. *Id.* The Renewed Motion should be denied on this ground alone.

Moreover, OMC "must actually show based on the facts of [the] case that irreparable harm was 'likely,' not merely possible, in the absence of an injunction." *Hoop Culture, Inc. v. GAP Inc.*, 648 F. App'x 981, 985 (11th Cir. 2016). "[T]he Eleventh Circuit has recently emphasized that Plaintiffs have the burden to show a likelihood of irreparable harm based on independently proved facts." *Island Stone Int'l Ltd. v. Island Stone India Private Ltd.*, No. 616CV656ORL40KRS, 2017 WL 5632719, at *6 (M.D. Fla. Nov. 3, 2017). Despite a second

bite at the apple, OMC failed to present any fact, let alone "independently proved facts" supporting irreparable injury. As addressed in more detail below, no competent evidence suggests confusion between the facilities is likely to occur. In fact, AdventHealth's naming protocol makes crystal clear the owner of its facility (i.e. ADVENTHEALTH Oviedo ER). OMC should simply add its brand "Oviedo Medical Center" to the otherwise purely descriptive Mark if it truly believes confusion is likely.

    **C.**  **OMC Failed to Establish a Likelihood of Success on the Merits**

        **a.**  **OMC Did Not Established Ownership of the Mark**

OMC asserts only common law rights in the Mark (Dkt. 1, pp. 20, 24.), and therefore bears the burden of establishing ownership of the mark via prior use in commerce. *Crystal Ent. & Filmworks, Inc. v. Jurado*, 643 F. 3d 1313, 1321 (11th Cir. 2011). OMC attempts to discharge this burden by boldly claiming that "in 2017, it acquired the rights in the OVIEDO ER trade name and service mark from its predecessor" (Dkt. 1, ¶ 18), a claim repeated unequivocally in the Original and Renewed Motions. The only evidence of the 2017 acquisition was a Quitclaim Deed presented in the Renewed Motion (Dkt. 23-5, Ex. 2) for the transfer of real property. After withdrawing its Original Motion for numerous procedural failures, OMC now admits that there was, in fact, no acquisition of the Mark in 2017. Instead, OMC bases its entire ownership claim on the Mark on a back-dated assignment of intellectual property executed just weeks before this lawsuit was filed. (Dkt. 23-5, Ex. 4.) OMC's *nunc pro tunc* assignment is ineffective and underscores that the Mark was little more than an afterthought devised by OMC in response to AdventHealth's announcement of the AdventHealth Oviedo ER.

"*Nunc pro tunc*" assignments are disfavored if "clearly created for the purpose of sustaining plaintiff's position in . . . litigation." *Wallace Intern. Silversmith's, Inc. v. Stanley Roberts, Inc.*, No. 87 Civ. 3574, 1990 WL 123793, *2 (S.D.N.Y. Aug.8, 1990). A *nunc pro tunc* assignment is an assignment made now of something which was previously done, to have effect as of the former date. The purpose of such an assignment is to clarify the record so that it shows something that actually occurred, but has been omitted from the record through inadvertence or mistake. *Hotel Corp. of Am. v. Inn Am., Inc.*, 153 U.S.P.Q. ¶ 574 (BNA) (T.T.A.B. Mar. 16, 1967). For example, an ineffective oral assignment can be corrected later via a written *nunc pro tunc* assignment. *See, e.g., Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.*, 29 F.3d 1529, 1533 (11th Cir. 1994) (court allowed oral agreement to transfer copyright to take effect *nunc pro tunc* to date of oral agreement by later writing).

OMC presents no evidence whatsoever of any underlying mistake or omission regarding the 2017 transaction. Nor is there any hint of a need to clarify the record of an intent to transfer intellectual property or associated goodwill at that time. Rather, OMC's evidence shows that on January 30, 2017, OMC acquired real property via Quitclaim Deed (Dkt. 23-5, Ex. 2), which makes no reference to trademarks or intellectual property generally, let alone the Mark asserted here. OMC proffers no testimony suggesting a failure to properly document the Mark's assignment as part of the 2017 transaction warranting the corrective nunc pro tunc assignment this year. Rather, the January 30, 2017 Quitclaim Deed conveyed exactly what the parties wanted to convey—real property—nothing more.

It is well settled that merely purchasing a building is insufficient to confer ownership of any trademarks associated with the building. *See Long Grove Investments, LLC v. Baldi*

*Candy Co.*, No. 18-CV-5237, 2019 WL 3716841, at \*4 (N.D. Ill. Aug. 7, 2019) (the mere purchase of real property once associated with a trademark is insufficient to confer ownership of the trademark); *see also Russell Rd. Food & Beverage, LLC v. Galam*, 180 F. Supp. 3d 724, 737 (D. Nev. 2016) (owner of the property where a former strip club—the "Crazy Horse Too" club—was situated did not own the "Crazy Horse Too Mark"). Thus, in the absence of any evidence of a mistake or omission, OMC's *Nunc Pro Tunc* assignment is ineffective and does not vest OMC with any trademark rights.  Without rights in the Mark, OMC's underlying claims fail and the Renewed Motion must be denied.

### b.   OMC Has Not and Cannot Establish Any Likelihood of Confusion

Another independently sufficient basis for denial of the Renewed Motion is OMC's failure to establish any likelihood of confusion. In determining whether marks are likely to be confused, courts in the Eleventh Circuit consider seven factors: (1) the type of mark, (2) the similarity of the marks at issue, (3) the similarity of the services the marks represent, (4) the similarity of the parties' service outlets and customers, (5) the nature and similarity of the parties' advertising media, (6) the defendant's intent, and (7) any actual confusion. *You Fit*, 2013 WL 521784, at \*2 (quotation omitted). The balance of these factors tips decidedly in favor of AdventHealth.

### i.   *FACTOR ONE: The Mark is unprotectable, or at best, weak*

The Mark describes OMC's location in Oviedo and the emergency services it provides. The descriptive nature of the mark renders it unprotectable, or at best, extremely weak. The leading treatise on trademark law notes that "[d]escriptive geographical terms are in the 'public domain' in the sense that every seller should have the right to inform customers

of the geographical origin of his goods." 2 J. THOMAS MCCARTHY, McCarthy on Trademarks §14:1 (2019); *accord* Restatement Third, Unfair Competition §14, comment d (1995) ("merchants should remain free to indicate their place of business or the origin of their goods without unnecessary risk of infringement"). "These geographical terms should remain free for all sellers in that portion of the world to use descriptively with equal honesty." 2 J. THOMAS McCARTHY, McCarthy on Trademarks §14:1 (2019). As such, "terms that are descriptive of the geographic location or origin of goods and services are regarded by the law as not being 'inherently distinctive' marks." *Id.* The law only permits enforcement of geographically descriptive marks if, through usage, the mark has become distinctive via acquisition of "secondary meaning" in the minds of the consuming public. *Id.*

<u>OMC Cannot Establish Five Years of Continuous Use.</u>

Conceding that the Mark is descriptive, OMC relies on 15 U.S.C. § 1052(f) to argue that the mark has "acquired distinctiveness" via "substantially exclusive and continuous use" for "over five years." (Dkt. 1, ¶ 38.) This statute can be used to establish a *prima facie* case of acquired distinctiveness when registering marks on the Principal Register of the U.S. Patent and Trademark Office ("USPTO"). 15 U.S.C. § 1052(f). In this case, OMC attempts to establish five years of continuous use by tacking onto the rights of Central Florida Regional Hospital, Inc., which purportedly opened the facility in November of 2013. (Dkt. 1, ¶ 39.) OMC tries this legal sleight of hand by recasting a 2017 Quitclaim Deed it received from Central Florida Regional Hospital as a trademark assignment. But as explained in Section III(C)(a) *supra*, OMC cannot simply conjure up a trademark assignment where one did not originally exist. In the absence of a valid trademark assignment, OMC cannot establish five

years of continuous use and cannot lay claim to the presumption of § 1052(f). The Renewed

Motion must, therefore, be denied.

<u>OMC Lacks Evidence of Secondary Meaning.</u>

Even if OMC could establish five years of use, § 1052(f) is merely a presumption

employed by the USPTO in evaluating pending trademark applications. Standing alone it is

insufficient to discharge the "high degree of proof necessary to establish secondary meaning

for a descriptive term." *Gulf Coast Commercial Corp. v. Gordon River Hotel Assocs.*, No.

2:05CV564-FTM-33SPC, 2006 WL 1382072, at *8 (M.D. Fla. May 18, 2006). In the

absence of consumer survey evidence "four factors can be considered in determining whether

a particular mark has acquired secondary meaning: "(1) the length and manner of its use;

(2) the nature and extent of the advertising and promotion; (3) the efforts made by the

plaintiff to promote a conscious connection in the public's mind between the name and the

plaintiff's . . . business; and (4) the extent to which the public actually identifies the name

with the plaintiff's [service]." *Investacorp Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d

1519, 1525 (11th Cir. 1991). Notably, in *Investacorp*, the Court of Appeals for the Eleventh

Circuit disregarded five years of continuous use because there was "nothing significant"

about the plaintiff simply displaying its service mark on transactional documents. *Id.*

In the present case, OMC has not come forward with any consumer surveys or other

evidence suggesting that that "Oviedo ER" has come to be recognized as uniquely

identifying the emergency room services offered by OMC. *See Deltona Transformer Corp.*

*v. Wal-Mart Stores, Inc.*, 115 F. Supp.2d 1361, 1367-69 (M.D. Fla. 2000) (denying

preliminary injunction in the absence of consumer survey of secondary meaning). To the

contrary, the evidence demonstrates that OMC only recently began using the Mark in response to AdventHealth's announced facility.

Ovideo ER Signage and Advertising.

OMC presents the Affidavit of Cathleen Droke as evidence that an "Oviedo ER" sign was present when the facility opened on November 25, 2013. (Dkt. 23-1, ¶ 7.)  She further testifies regarding registration of the oviedoer.com domain name as early as November 30, 2012. (*Id.,* ¶ 8.) Although Ms. Droke makes passing reference to other "signage and marketing materials" in use following the opening of the facility in 2013, she presents no examples of this older usage. (*Id.*) Ms. Droke does present examples of far more recent marketing materials in Exhibits 19, 20, and 21 of her Affidavit. Yet, Exhibit 19 is dated April 24, 2019, Exhibit 20 is dated May 13, 2019, and Exhibit 21 is undated. (Dkt. 23-1, ¶ 26-27.) These materials should be disregarded because they are all dated well after AdventHealth announced its facility in November of 2018. *See Main Street Assoc. v. Main Street USA*, 2006 WL 8439400, *7 (MD Fla 2006) (disregarding advertising materials dated after defendant's entry into the marketplace). Furthermore, in these recent materials, "Oviedo ER" is not prominently displayed in the advertisement. Rather, one must wade into the narrative of the advertisement to find a reference to "Oviedo ER at Oviedo Medical Center." (Dkt. 23-1, ¶¶ 26-27.) Thus, the only evidence OMC presents of the Mark being used in 2013 is a single sign and a domain name.

Regarding the "Oviedo ER" sign, as reflected in the video and photographs (Ex. C, Aaron Aff., ¶¶ 6-7.), it is simply not possible to clearly view this sign from any adjacent roadways. (*Id.,* ¶¶ 2-5.) Nor does this sign face the front entrance to the ER. (*Id.*) In fact, the

only patients gaining a clear view of this sign would be the individuals leaving the emergency room. Other signage leading into the facility, which is clearly visible from the roadway, simply references "Oviedo Medical Center" without any mention of the Mark. (*Id.*) OMC is not attempting to promote a conscious connection in the public's mind if it is not even using the Mark to attract people passing its facility. This demonstrates that OMC has not employed the Mark in a manner for it to gain secondary meaning.

Regarding the domain name, notably absent from Ms. Droke's affidavit is any indication of *when* the website went live or what was present on the oviedoer.com webpage. The registration of the domain, by itself, is of no value. *See Sound Surgical v. Rubinstein*, 734 F. Supp.2d 1262, n. 21 (MD Fla. 2010) (registering a domain name, without more, does not constitute commercial use and does not violate the Lanham Act). Currently, the www.oviedoer.com domain (last visited 9/11/2019) re-directs consumers to the "Emergency Care" page of https://oviedomedicalcenter.com/ (last visited 9/11/2019). (Ex. D.) The Emergency Care page describes the emergency services provided at Oviedo Medical Center and currently shows OMC's use of the word mark as "Oviedo ER[sm] at Oviedo Medical Center." (*Id.*) It also shows a stylized version of the mark, which OMC has not asserted. Critically, as recently as August 19, 2017, this same webpage contained *absolutely no* reference to the Mark! (Ex. E, Butler Aff., ¶ 6.) Thus, as late as August of 2017 – and perhaps even later[3] – OMC was simply advertising that "When you need emergency services, count on Oviedo Medical Center." (*Id.*) Thus, contrary to its allegations, and as recently as

---

[3] Note that August 19, 2017 appears to be the last time the page was archived.  Thus, the exact date the webpage was updated to include the Mark is uncertain.  AdventHealth will seek discovery regarding the date and substance of these changes.

two years ago, OMC did not even view "Oviedo ER" as a trademark. This undercuts Ms. Droke's claim that Oviedo ER was used in marketing materials since 2013.  Moreover, it further illustrates that far from a mark cloaked with secondary meaning, the Mark was an afterthought, devised in response to legitimate competition from AdventHealth.

<u>News Reports and Social Media Posts.</u>

The cited news articles in support of secondary meaning are similarly unavailing. (Dkt. 23-1, ¶¶ 13-24.) The news articles cited are not advertising and do not represent efforts by OMC to promote the Mark. The articles never use trademark or service mark symbols when referencing "Oviedo ER." Instead, they simply reflect use of "Oviedo ER" in its primary, descriptive sense – the same way that AdventHealth uses the term to describe its emergency care facilities. Such descriptive uses do not constitute trademark usage and cannot establish secondary meaning. *See Commodores Entm't Corp. v. Thomas McClary*, No. 614CV1335ORL37GJK, 2015 WL 12843872, at *2 (M.D. Fla. Mar. 10, 2015) (noting that descriptive terms may always be used in their primary descriptive sense).

Ms. Droke's reference to various Facebook® posts is also insufficient for secondary meaning. The screen shots provided by Ms. Droke are not taken from OMC's Facebook® page (Dkt. 23-1, Ex. 6.), likely because nowhere on OMC's Facebook® page does OMC advertise "Oviedo ER" or even "Oviedo ER at Oviedo Medical Center." Instead, the entire page simply features the name "Oviedo Medical Center." (Ex. F, Colitz Aff., ¶ 1.) OMC responds to patient inquiries not as "Oviedo ER," but as "Oviedo Medical Center," and patients identify OMC's ER services with a variety of names other than the Mark. Thus, OMC's Facebook® page is entirely consistent with its current street signage and how it

presented itself on its website at least until August of 2017. OMC's exhibits establish it never seriously considered "Oviedo ER" as a trademark until AdventHealth's entry into the marketplace.

<u>Advertising Expenditures and Patients Served.</u>

Ms.  Droke also states that "[s]ince the Oviedo ER facility opened in 2013, Central Florida Regional Hospital and Oviedo Medical Center have collectively spent in excess of $1.3 million in advertising and promotional costs related to the promotion of the Oviedo ER branded facility." (Dkt. 23-1, ¶ 30.) OMC's current CEO, Mr. KC Donahey, further states that, "[s]ince it opened in 2013, the Oviedo ER facility has served over 135,000 patients." (Dkt. 23-5, ¶ 12.) Both these assertions use clever wording to avoid the relevant question: how much money has OMC spent promoting the "Oviedo ER" trademark. Promotions "related" to the "facility" do not necessarily feature the "Oviedo ER" trademark. Given that until at least August of 2017, the Mark was not even featured on OMC's website and that OMC's current Facebook® page still does not feature the mark, one can only surmise that the $1.3 million was spent advertising other marks. Any amounts spent promoting other marks associated with OMC are simply irrelevant to the question of secondary meaning. Similarly, although serving 135,000 patients is certainly commendable, it offers no insight into the efforts OMC expended marketing the Mark.

<u>Pending Trademark Applications.</u>

OMC's Renewed Motion also references two pending federal trademark applications. (Dkt. 23, p. 3.) The existence of these applications is irrelevant as OMC's Complaint contains no cause of action for infringement of a federally registered mark. *See, e.g. Jat*

*Wheels, Inc. v. JNC Wheel Collection*, 2014 WL 4568323, *2 (CD Cal. 2014) (noting that a claim for infringement under 15 U.S.C. §1114 is "clearly frivolous" in the absence of a federal registration). To the extent the Court affords any weight to these pending applications, the following issues should be addressed. First, in both applications OMC's address is listed as Nashville, Tennessee. (Dkt. 23-2.) This is relevant because absolutely nothing in these applications alerted the Examining Attorney that "Oviedo" is a City in Florida. Thus, the USPTO had no way to ascertain that Oviedo ER is geographically descriptive. Second, as indicated in the "Assignment Abstract of Title Information" the *Nunc Pro Tunc* assignment OMC now relies upon was not provided to the USPTO. (Dkt. 23-2.) AdventHealth will likely be addressing these issues with the USPTO upon the issuance of the registrations. In the meantime, the applications should be disregarded by the Court.

In conclusion, the evidence indicates that OMC only recently began using the Mark in response to AdventHealth announcing its facility. The token uses that have been presented are woefully short of the type needed to establish secondary meaning. Factor one itself is determinative here and warrants a denial of OMC's Renewed Motion.

### ii.   FACTOR TWO: The Marks Are Not Meaningfully Similar

Contrary to OMC's argument, the two marks are not identical. Ample case law establishes that marks should not be dissected when comparing any alleged similarity. Instead, "[t]o determine if two marks are similar, the court 'considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used.'" *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1168 (11th Cir. 2019) (*quoting Frehling Enterprises, Inc. v. Int'l Select Grp., Inc.,* 192 F.3d 1330, 1337 (11th Cir. 1999)).

"Similarity must be determined by considering the overall impression created by the mark as a whole rather than simply comparing individual features of the marks." *Sovereign Military Hospitaller v. Fla. Priory of the Knights Hospitallers*, 809 F.3d 1171, 1186 (11th Cir. 2015) (*quoting Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 505 (5th Cir.1980)).

As evidenced by the parties' respective websites, OMC currently displays its mark as "Oviedo ER at Oviedo Medical Center" while AdventHealth displays its mark as "AdventHealth Oviedo ER." (Exs. B, D.) Thus, when one takes into account the "overall impressions that the marks create" and the "manner in which they are used" they are properly compared as follows:

**Oviedo ER at Oviedo Medical Center**

**AdventHealth Oviedo ER**

*PlayNation*, 924 F.3d 1168.

These marks are easily distinguishable. One prominent difference concerns the placement of "Oviedo ER," which is clearly reversed between the two marks. Namely, "Oviedo ER" forms the beginning of OMC's mark and the ending of AdventHealth's mark. Furthermore, the dominant part of AdventHealth's mark is unsurprisingly "AdventHealth." This is consistent with its nationwide naming convention. (Ex. A, Carter Aff., ¶ 3.) By contrast, the dominant part of OMC's mark is the geographic term "Oviedo." OMC's mark conveys that it is an ER located "at" a larger medical center. The AdventHealth mark, by contrast, conveys that it is a freestanding ER. This reflects the different services provided at the two facilities. OMC's mark is also much longer, consisting of six words, all of which are descriptive. This is compared to AdventHealth's much shorter three word mark, featuring its

16

trademark "AdventHealth." Given these stark differences, consumers will undoubtedly be able to distinguish the two marks. This factor overwhelmingly favors AdventHealth.

### iii. FACTOR THREE: The Services are Different

OMC's Motion agues, without presenting any evidence, that the services performed by the parties are "identical." This is simply not the case, and as noted in Factor Two above, the difference in services is actually reflected in the two marks. Furthermore, according to its website, OMC is a medical center that "provides a full range of healthcare services." (Ex. G.) The AdventHealth facility, by contrast, is not a medical center and does not offer a full range of healthcare services, but is rather a freestanding ER. (Ex. B.) The differences in the two facilities tips this factor in AdventHealth's favor.

### iv. FACTORS FOUR/FIVE: OMC Offers no Evidence of Similar Customers or Media Outlets

OMC produced no evidence establishing the parties will service the same customers or utilize the same media outlets. Given that the AdventHealth facility has yet to open its doors, such evidence likely does not exist. Nonetheless, the Court should reject OMC's conjecture and legal arguments to support these factors.

### v. FACTOR SIX: Intent Has Not Been Established

The AdventHealth Oviedo ER mark was chosen as part of an established naming convention. (Ex. A, Carter Aff., ¶¶ 3-4.) This naming convention is used on a nationwide basis. No less than eleven AdventHealth facilities employ, or will employ, a similar name. (*Id.*) The consistency and logic of AdventHealth's naming convention completely refutes OMC's assertion that AdventHealth intended to capitalize off of OMC's mark.

### vi.   *FACTOR SEVEN: There is no Confusion*

OMC cites to only one example of supposed confusion. In doing so, it misrepresents the content of an article from the *Orlando Business Journal* ("OBJ"). (Ex. H.) Contrary to OMC's explanation, the article in question discusses the facilities of *both* parties. Equally important, the article reflects absolutely no confusion between them. As noted in the attached exhibit, the article clearly applies the correct name to both OMC's facility and the AdventHealth facility. (*Id.*, p. 3.)

The OBJ article actually raises further serious questions regarding OMC's ownership claims over the "Oviedo ER" mark. As illustrated in Exhibit F, the OBJ article actually lists HCA Healthcare Inc. as the operator of the "Oviedo ER" and not the Plaintiff Oviedo Medical Center, LLC. (*Id.*) This raises further questions about the 2017 acquisition. The OBJ article also labels Plaintiff's facility as "Oviedo ER (Now Oviedo Medical Center)," hereby raising other questions about whether the Mark has been changed. (*Id.*) Finally, a review of the 23 different ERs featured in the article shows that many of them follow a similar naming protocol.

OMC also presents the Affidavit of Lars White who suggests emergency responders are so incompetent and systems so disorganized that similar sounding facility names could create mass confusion leading to patient harm or even death. (Dkt. 23, p. 22.) Nothing could be further from the truth. Even Mr. White, a board member of OMC, confirmed that emergency responders do not consider the branding of a facility when deciding where to take a patient. Rather, Mr. White states that dispatchers "create unique radio identifications" for each medical facility and that emergency responders use these identifiers when responding to

a call. (Dkt. 23-4, ¶ 26.) These "radio identifications" are different from any trademarks or branding. Interestingly, Mr. White's testimony is echoed by the former Fire Chief for the City of Orlando, Mr. James Reynolds. (Ex. I, Reynolds Aff., ¶ 14.) Mr. Reynolds confirms that emergency responders "do not consider the branding of a facility" when responding to a call but rather use "short hand clarifying names." (*Id.*) These naming conventions would likely be discussed and worked out during regular tri-county meetings that are held for the specific purpose of ensuring effective and efficient communication between providers and emergency responders. (*Id.,* ¶ 9; Ex. J, Crocker Aff., ¶¶ 5-6.) All area healthcare providers employ EMS liaisons who facilitate communications with emergency responders and who provide tours of relevant facilities. (Ex. J, ¶¶ 5-8.) Thus, the potential for confusion OMC attempts to manufacture here is greatly exaggerated given existing protocols used by well-trained, well-educated, emergency responders and administrators.

### D.   OMC Failed to Establish the Remaining Elements Necessary for a Temporary Injunction

#### a. The Harm to AdventHealth Exceeds the Potential Harm to OMC

While OMC has presented no competent evidence it will suffer harm, AdventHealth presented evidence that it will be significantly harmed by the issuance of an injunction. First, the forced departure from its deliberate, universally employed naming protocol will undermine the key characteristic of its national branding strategy – consistency and clarity in patient communication. (Ex. A, Carter Aff., ¶¶ 3, 7-8.) Moreover, AHCA's final licensing inspection of the AdventHealth Oviedo ER is scheduled October 10, 2019. (Ex. K, ¶ 3.) Assuming the facility passes inspection, AHCA will license the facility to open October 17, 2019. (*Id.*) Because the license will issue under the registered fictitious name "AdventHealth

Oviedo ER," AdventHealth will not be able to operate the facility under a different fictitious name until AHCA reissues a new license. (Ex. K, ¶ 4.) AHCA will not reissue the license under a different name until a new fictitious name is registered with the Florida Department of State, Division of Corporations. (Ex. K, ¶ 5). AdventHealth will incur significant costs and lost profits each day the facility remains closed after the projected opening date that it can never recover.

### b. The Public Interest Weighs Against the Issuance of an Injunction

The public interest would not be served by allowing OMC to claim the geographic and categorically descriptive Mark to the detriment of AdventHealth and the Oviedo community – especially in the provision of emergency medical care. If the Court grants the requested relief the Oviedo community will be deprived of another facility providing life-saving care in the area. As described above, this lawsuit is economically motivated to bar or make more difficult its competitor's access to the Oviedo Market. Granting the relief, based on the purely descriptive, weak Mark in context of emergency medicine would not serve the public interest.

### E. A Sizable Bond and Evidentiary Hearing are Required if an Injunction Issues

The purpose of the required bond is to compensate AdventHealth if a wrongful injunction issues. Merely stating that Defendant will not prevail is wholly insufficient to avoid the bond requirement, which likely provides the only remedy for an injunction issued in error. AdventHealth will incur significant costs and lost profits if the injunction issues and respectfully requests the Court set an evidentiary hearing to determine the sufficiency of the required bond in that event.

WHEREFORE, AdventHealth requests this Court enter an order denying OMC's Motion for Preliminary Injunction.

Respectfully submitted this 3rd day of October, 2019,

/s/ *Mayanne Downs*
Mayanne Downs
Florida Bar No. 754900
Primary: mayanne.downs@gray-robinson.com
Secondary: kathy.savage@gray-robinson.com
Michael J. Colitz, III
Florida Bar No. 164348
Primary: michael.colitz@gray-robinson.com
Secondary: jessica.gonzalez@gray-robinson.com
Jason Zimmerman
Florida Bar No. 104392
Primary: jason.zimmerman@gray-robinson.com
Secondary: cindi.garner@gray-robinson.com
**GrayRobinson, P.A.**
301 E. Pine Street, Suite 1400 (32801)
P.O. Box 3068
Orlando, Florida 32802
Telephone:  (407) 843-8880
Facsimile:  (407) 244-5690

*Attorneys for Defendant,*
*ADVENTIST HEALTH SYSTEM/SUNBELT, INC.*
*D/B/A ADVENTISTHEALTH OVIEDO ER*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 3, 2019, a true and correct copy of the foregoing

was filed through the CM/ECF system which will serve an electronic copy on

*Counsel for Plaintiff, Oviedo Medical Center LLC*:

Martin B. Goldberg, Esq.
Emily L. Pincow, Esq.
Lash & Goldberg, LLP
Miami Tower
100 SE 2nd Street, Suite 1200
Miami, Florida  33131-2158
mgoldberg@lashgoldberg.com
epincow@lashgoldberg.com

Dennis D. Murrell
Elisabeth S. Gray
Brian McGraw
Middleton Reutlinger
401 S. Fourth Street, Suite 2600
Louisville, Kentucky  40202
dmurrell@middletonlaw.com
egray@middletonlaw.com
bmcgraw@middletonlaw.com

/s/ *Mayanne Downs*
Mayanne Downs
Florida Bar No. 754900

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Affidavit of Frank Carter |
| B | Print out of https://www.adventhealth.com/hospital-and-emergency-rooms/adventhealth-oviedo-er last visited 9/11/2019 |
| C | Affidavit of Jeffrey M. Aaron |
| D | Print out of https://oviedomedicalcenter.com/service/emergency-care last visited 9/11/2019 |
| E | Affidavit of Christopher Butler |
| F | Affidavit of Michael J. Colitz, III |
| G | Print out from https://oviedomedicalcenter.com/home/ last visited 9/11/2019 |
| H | Print out of the article along with the associated "slide show" from https://www.bizjournals.com/orlando/news/2019/06/12/metro-orlandos-number-of-freestanding-ers-on-the.html last visited 9/11/19 |
| I | Affidavit of James M. Reynolds |
| J | Affidavit of Nicole Crocker |
| K | Affidavit of Diane Godfrey |